Freeman vs. Bass.

WILLIAM FREEMAN, plaintiff, vs. NATHAN BASS, defendant.

[1.] Confederate notes received by the holder and entered as a credit on a promissory note, is a valid payment.

[2.] The entry of a credit, dated in 1863, on a promissory note, is not *prima facie* evidence that such payment was made in Confederate notes.

[3.] Cases pending in the District Courts of the United States for Georgia, at the time the State seceded, were, according to the Act of the Confederate Congress, properly cognizable by the District Courts of the Confederate States.

[4.] Parol evidence is not admissible to ingraft a new stipulation upon a contract reduced to writing.

[5.] When the subject matter of defence to a promissory note has been passed upon by a Court of competent jurisdiction, such judgment, while in force, is conclusive.

[6.] By the laws of Arkansas, as well as those of Georgia, a mortgage is a mere security

Complaint.   In Bibb Superior Court.   Tried before JUDGE COLE.   May Term, 1866.

This was a double bill of exceptions, each party complaining of some of the rulings of the Court.

The action below was by Freeman against Bass, on a promissory note for $28,200, dated Arkansas, Chicot county, 5th of November, 1858, and due January 1st, 1862, with interest from January 1st, 1859, at the rate of eight per cent. Credits were entered upon the note as follows : October 21st, 1862, $6,850 ; July 6th, 1863, $4,000 ; August 14th, 1863, $2,000 ; September 2d, 1863, $20,506 12.

This note was one of several given for the purchase money of a plantation, and certain negroes, stock, etc.

The defendant, by his pleas, sought to recoup against the plaintiff's demand, damages laid at $10,000, resulting, as was alleged, from the unsoundness of one of the negroes, named Mark Henry, the non-delivery of another, named Betty, the destruction and non-delivery of the stock of hogs, the negligence and want of care of the plaintiff in respect to the crop of corn and the horses and mules on the plantation, the non-delivery of carpenter's tools, some blankets and negro shoes, some osnaburgs, and some beds, mattresses, and household and kitchen furniture, the unauthorized consumption of provisions, and the failure of the plaintiff to apply the labor of the negroes to improving the plantation.

He also set up failure of consideration by the emancipation of the slaves, presenting this defence first by a plea of total failure, and then by a plea of partial failure of consideration.

The following documents, brought into the case at the trial, should now be described.

1. A bill of sale executed in the State of Arkansas, reading as follows :

"Know all men by these presents, that I, William Freeman, of the county of Barbor, State of Alabama, for, and in consideration of the sum of $73,000, have bargained, sold, and delivered, and do by these presents bargain, sell and deliver to Nathan Bass, of the county of Bibb, in the State

of Georgia, and to his heirs and assigns forever, the follow-ing negroes, slaves for life, now being upon the plantation this day purchased by the said Bass from the said Freeman, situated in Chicot county, and State of Arkansas, to-wit: (*here the negroes are described.*) And for the consideration aforesaid, the said Freeman has also bargained, sold, and delivered to the said Bass the entire stock of mules, horses, cattle, and hogs, corn, fodder, wagons, carts, blacksmith tools, gins, cotton seed, household and kitchen furniture, ploughs, plantation tools, and all other property of a perishable nature, now being upon and belonging to the plantation this day sold by the said Freeman to the said Bass, lying in said county of Chicot, and State of Arkansas.

And the said Freeman, for himself, his heirs, executors, and administrators, doth hereby covenant to and with the said Bass, his heirs, executors, and administrators, that he has a good and perfect title to the property herein before mentioned and conveyed to the said Bass; that the same is free from all incumbrances done, had, or suffered by the said Freeman, and that he has full legal authority to sell and convey the same. And the said Freeman, for the consideration aforesaid, doth hereby guarantee and warrant unto the said Bass, his heirs, and assigns, that each and all of the negro slaves, excepting Louisa, a negro woman, aged about thirty years, and afflicted with palpitation of the heart, herein before mentioned and conveyed, are healhty and sound, both in body and mind. Witness my hand and seal, at Lake Village, this 5th day of November, A. D. 1858.

WILLIAM FREEMAN, SR. [L. S.]

2. A bond for titles, as follows, also executed in the State of Arkansas:

"Know all men by these presents, that I, William Freeman, Sr., of, etc., am held and firmly bound unto Nathan Bass, of etc., in the penal sum of $176,000, for the payment of which I bind myself, my heirs, etc., forever. In testimony

whereof, I do hereby set my hand and affix my seal, this 5th day of November, 1858."

Now, the condition of the above obligation is such, that the above bound William Freeman hath this day sold, and doth by these presents, grant, bargain, sell, and convey unto the said Nathan Bass, all those certain tracts and parcels of land, lying and being in the county of Chicot, and State of Arkansas, and known and described — (*Here follows the description.*) And, whereas, the said Bass hath this day purchased of me the following negroes, slaves for life, (*describing them*) being seventy-three slaves in all. Said sale of lands and slaves, as aforesaid, being for and in consideration of $161,000, to be paid as follows, to wit: $20,000 on the 1st of January, 1859 ; $28,200 on the 1st January, 1860 ; $28,200 on the 1st of January, 1861 ; $28,200 on the 1st of January, 1862 ; $28,200 on the 1st January, 1863 ; and $28,200 on the 1st January, 1864 ; which said six several sums are evidenced by the six several promissory notes of said Nathan Bass, all of even date herewith　*　* and all except that one due January 1st, 1859, are to bear interest from the last named date until paid, at the rate of eight per cent. per annum ; and, to secure the payment of which said six several notes, a lien is hereby expressly reserved by the said William Freeman on the slaves herein named.

Now, should the said William Freeman, his heirs, etc., make or cause to be made a good and lawful deed, in fee simple, for the lands herein conveyed and sold　*　* upon final payment as aforesaid, then this obligation to be void, otherwise, to remain in full force and virtue.　*　*　*

And I, the said William Freeman, for the considerations above stated, and for divers other good and valuable considerations, hereby promise and agree with the said Nathan Bass, to deliver him possession of the above described lands, slaves, and the other personal property this day sold to him, on the first of January, 1859, or sooner if the crops be

Freeman vs. Bass.

gathered.   But it is expressly understood that the said Freeman does not agree to deliver said property in any case where he may be prevented from so doing by death, fire, or other casualty, not resulting from his own carelessness or negligence.                    WILLIAM FREEMAN, SR. [L. S.]

3. The exemplified record of an action of assumpsit, predicated on that note described in the foregoing bond which fell due January 1st, 1860, commenced by Freeman against Bass on the 27th of January, 1860, in the District Court of the United States, for the Southern District of Georgia, and prosecuted to judgment in the corresponding Court of the Confederate States, at January term, 1862.

The declaration stated on its face that the plaintiff, Freeman, was a citizen and resident of the State of Texas ; and at June term, 1861, the defendant demurred to the jurisdiction, on the ground, that by the constitution of the Confederate States, the Court had no jurisdiction, the plaintiff being a citizen and resident of the Confederate States.   The Court overruled the demurrer, and likewise dismissed a plea presenting the same defence.

The cause afterwards, at January term, 1862, came to trial on sundry pleas to the merits.   These were, 1. *Non-assumpsit*.   2. Failure of consideration, because of the unsoundness of one of the negroes, named Mark Henry, and the non-delivery of another, named Delia; also, the non-delivery of mules, horses, cattle, hogs, carpenter's tools, household and kitchen furniture, etc.   3. Partial failure of consideration on the same facts, with the addition of the plaintiff's failure to employ the negroes in clearing land and improving the plantation, and his unauthorized consumption of provisions.   4. Set off, embracing a claim for the value of the unsound negro, and of all the property enumerated in the preceding pleas as undelivered, and of some besides.

The jury found for the plaintiff $27,165, with eight per cent. interest on the note, from the 1st of January, 1859, and judgment was entered up accordingly.

4. A bill in equity, filed by the plaintiff, Freeman, against the defendant, Bass, in Bibb Superior Court, in April, 1863, with an injunction restraining Bass from selling any of the negroes described in the foregoing bill of sale and bond for titles, that might be in this State; the bill praying for the foreclosure of the plaintiff's alleged mortgage on said negroes, (evidenced by his reservation of lien, contained in the said bond for titles) to satisfy the note upon which the present suit is founded, and the three others which fell due next after it, as well as for injunction to prevent a sale of the negroes by defendant.

These documents being sufficiently described, what transpired at the trial will now be stated.

The plaintiff read his note, with the credits thereon, and closed.

The defendant introduced certain evidence taken by interrogatories. The plaintiff objected to the answer of a witness, *Davis H. McElroy*, to one of the interrogatories propounded to him, and the Court sustained the objection and ruled out the answer. This interrogatory and the answer to it were as follows: *Int.* 16—"Did or not Freeman, in the trade, agree to let his slaves not sold and those that were sold, work clearing land, and whilst not clearing land, gather the crop, till time of delivery, and did they thus work; and if not, what was the damage." *Answer.*—"Freeman, the plaintiff, agreed that the negroes sold to Bass, as well as those not sold, which was about twenty-five hands in number, when not employed in saving the crop, should be clearing land for the defendant Bass, so long as they remained on the place. There was a considerable portion of the time in which they were not employed in saving the crop, nor were they employed in clearing land for defendant, but were idle and an expense, as they were supported by the provisions on the place. After the crop was gathered, Freeman remained on the place one week, during which time he hired eighteen or twenty of the hands not sold, to one of his neighbors to pick cotton, who were also subsisted by provisions on the place

which he had sold to Bass. I think the damage to defendant, by reason of their not clearing land, from four to five hundred dollars. There were about seventy-five hands in all.

The defendant also introduced the bill of sale and the bond for titles. Also the statute of the State of Arkansas showing that the Common Law and Statutes of Great Britain, of force in the fourth year of the reign of James the First, (as far as suitable to the condition of the people of that State) had been adopted by the statutes of that State, and declared of force. He, also, introduced (plaintiff objecting to it on the ground of irrelevancy, and the objection being overruled by the Court) the bill in equity above described. He proved by *E. A. Nisbet, Esq.*, the counsel who filed said bill, that the same was dismissed in February, 1866, by the complainant, for the reason that it had performed its office. He offered to prove by the same witness, that, shortly before the filing of said bill, the defendant offered to cancel the trade with the complainant, and deliver back both land and negroes and the perishable property on the plantation, and let the improvements in the clearing of land and the payments made, go against hire and rents. But the Court, on objection from plaintiff's counsel, rejected this evidence.

Here the defendant closed; and the plaintiff then introduced the record from the District Court of the Confederate States, above described—the defendant objecting to it on the ground of irrelevancy, and on the further ground, that said District Court had no jurisdiction of the case, of the subject matter, or of the parties; which objection the Court overruled. He also proved, that subsequent to the rendition of the judgment in said case, the defendant paid it off in full. He introduced evidence proving the value of Confederate States treasury notes at the date of the several credits indorsed upon the note sued on in the present action; to which evidence the defendant objected on the ground of irrelevancy, and on the ground that the payments could not be thus abated. The Court both overruled the objection and decided that

46

the dates of the credits were *prima facie* evidence that the payments were made in such notes.

The plaintiff having again closed, defendant read in evidence the Ordinance of a Convention of this State, passed January 29th, 1861, and entitled, " An Ordinance to abolish the Circuit and District Courts of the United States for the District of Georgia, and to establish other Courts in lieu thereof, and to continue in force certain judgments and executions." He also offered several witnesses to prove the value of the services of his counsel in defending the suit against him in the Confedearate States Court, and the amount actually paid therefor by defendant.    This evidence the Court rejected.

The Court charge the jury, among other things, as follows :

1. That the credits on the notes were not subject to be opened and reduced by reason that the payments may have been made in Confederate treasury notes.

2. That the Confederate Court had jurisdiction of the case, the subject matter, and the parties, embraced in the exemplified record, and that any defence pleaded and passed upon, in that case, by the Court or jury, was conclusive on the defendant, Bass, and such matter so passed upon, could not again be set up as a defence in the case at bar.

3. That by the Code of Georgia, a mortgage is mere security for the payment of money ; that the two instruments dated November 5th, 1858, taken together, are, in equity, a mortgage for the payment of the $161,000 stipulated to be paid ; and that if, at the time of the filing of the bill by Freeman against Bass, in Bibb Superior Court, Bass was in default as to any of the payments stipulated, then Freeman had the right to file his bill in equity for the foreclosure of the mortgage as to such payments in arrear ; and if Bass was about to sell any or all of the slaves mortgaged, as stated in said bill, then he, Freeman, had the right to have the injunction prayed for and granted in that case, and the granting of the same was not error.    That the legal title to the negroes

was in Bass, notwithstanding the lien reserved as shown by the second instrument, and, on the emancipation of the slaves, the loss was that of the defendant, and not of the plaintiff; and that the matters aforesaid were no legal or equitable defence against the payment stipulated to be made for said slaves, and secured by the notes, nor against the present action, if the note sued upon were one of these.

4. That, as to the stipulation or representation in said two instruments of the 5th of November, 1858, respecting the negroes being slaves for life, its true construction is, that Freeman referred to the then status of the negroes, and not to what their future status might be made by future events; and their subsequent emancipation was Bass' loss and not Freeman's, and no available defence to this suit.

The errors assigned by Freeman are:

1. The admission of the bill in equity, in evidence.

2. The charge of the Court numbered 1.

Those assigned by Bass are:

1. The rejection of *Davis H. McElroy's* answer to the 16th interrogatory.

2. The rejection of that part of the evidence of *E. A. Nisbet, Esq.*, which was ruled out.

3. The admission in evidence, of the exemplification from the District Court of the Confederate States.

4. The admission of evidence as to the value of Confederate States Treasury notes.

5. The decision of the Court, holding that the dates of the credits were *prima facie* evidence that the payments were made in such notes.

6. The rejection of evidence, showing the value of counsel's services in defending the suit in the Confederate States Court, and the amount paid therefor.

7. The charge of the Court, numbered 2.

8. The same, numbered 3.

9. The same, numbered 4.

E. A. & J. T. NISBET and LOCHRANE, for Freeman.

B. HILL and BAILEY, for Bass.

WALKER, J.

The first error alleged by Freeman is, the admission in evidence of the bill filed by him against Bass. The object of its introduction is not very apparent, but, perhaps, as a part of the history of the whole transaction, it was not very objectionable.

[1.] His second complaint is, that the Court charged "That credits upon the notes were not subject to be opened and reduced by reason that the payments may have been made in Confederate treasury notes." The entries of the credits upon the notes seem to have been made by Freeman with a full knowledge of what he was doing; no fraud was practiced upon him; we presume he was twenty-one years of age, and had a right to satisfy the note in whole, or in part, if he saw proper to do so, without receiving any thing. He could, if he had wished to do so, have surrendered up the note to Bass without any consideration, and if so he certainly was competent to contract to receive payment in any thing he and his debtor might agree upon. We think the Court correctly instructed the jury on this point.

In this connection, it is proper to state that Bass had a right to complain of the admissibility of the evidence to prove that the dates of the credits were *prima facie* evidence that such payments were made in Confederate notes; but the instructions on this point to the jury prevented this evidence from doing him any harm,—the jury having allowed the entire amount of the credits.

[3.] One of the notes given for a portion of the purchase money of the plantation, negroes, etc., and of which the note here in controversy forms a part, was sued in the District Court of the United States at Savannah, and the defendant filed various pleas thereto. After the passage of the ordinance of secession and adoption of the Constitution of the Confederate States, the case was transferred to the District Court of the Confederate States. Defendant appeared,

and both demurred and pleaded to the jurisdiction of the Court, on the ground that Freeman, as shown by the pleadings, was a citizen of Texas—one of the Confederate States—and under the Confederate States Constitution, could not sue in that Court. The demurrer and plea were overruled, and defendant then filed, to that case, all the grounds of defence which he pleads to this action. The defendant, when the Court decided to sustain the action, submitted to its decision the determination of his various grounds of defence. Evidence was introduced, the issues passed upon, the judgment rendered, and defendant satisfied the judgment so recovered against him. The question here is, what effect shall be given to this judgment? The jurisdiction of a Court rendering a judgment is always open to inquiry. If a Court have jurisdiction of the person and subject matter, its judgments, until set aside, are conclusive. It may proceed irregularly—it may mistake the law—still, so long as it acts within its own jurisdiction, its judgments will be binding. Had the Court jurisdiction? The objection made to the jurisdiction is that, by an ordinance of. the convention of the people of Georgia, this case, with all others of a similar character, was transferred to the District "Courts of the independent State of Georgia," and that no provision was made for any transfer of such cases to the District Courts of the Confederate States. No point is made upon the failure of the Confederacy. I quote from the argument of our brother Hill: "Did the Confederate Court have jurisdiction? We say not. The fact that the Court assumed jurisdiction, and decided itself to have it, amounts to nothing, unless the Court, in fact, had it. The suit was properly pending in the Federal Court on the 19th day of January, 1861, and that Court, up to that time, had jurisdiction of the case. The Convention of that date, in Georgia, abolished that Court, and established in lieu thereof a State Federal Court, and removed the civil and criminal cases then pending in the Federal Court to the newly created State tribunal. How then did the Confederate Court at Savannah get jurisdiction

of this case? It is incumbent on the counsel for the defendant in error to show the mode by which it was done. It was a Court of limited, not general, jurisdiction; and the *onus probandi* is on him who asserts the jurisdiction to show it.

Let not the Court misunderstand us. We claim no advantage in this regard by reason of the result of the Confederacy. The pleas, in this case, were filed in 1862, and we claim now what we should have claimed had the case been tried then. Counsel for plaintiff may claim jurisdiction by reason of the judicial Act of the Confederate Congress under the Constitution. It is true that that Act did provide, that where the States had failed to take cognizance of the cases pending in the Federal Courts, and provide for their trial in the State Courts, that, in such case, the Court established under that Act should take jurisdiction. The cases in Georgia were within the express exception of the Act; and the Act, as to that provision in such cases as had not acted, was unconstitutional."

I have made this long quotation because it clearly states the question before us, and will make what I wish to say the more easily understood. It is true, that, by an ordinance of the Convention of Georgia, passed on the 29th January, 1861, all causes, civil and criminal, then pending in the Circuit Courts of the United States in and for Georgia, were transferred to, and all cases in the said District Courts were continued in, the District Courts of the State of Georgia thereby established.—*Journal of Convention*, 1861, p. 385. By another ordinance of the same Convention, page 393, "The Constitution for the permanent federal government of the Confederate States," was adopted and ratified. Now, while it is true that provision was made for organizing a State District Court, yet, in point of fact, no such Court was ever created. The Governor, who was, by the ordinance, authorized to appoint a District Judge, supposing, doubtless, that a Court would shortly be organized by the Confederate States Congress to take the place of the District Court of the United States, declined to appoint such Judge; and, as

a consequence, the Confederate States District Courts, ac-cording to the Act of Congress, *Statutes at Large Confede-rate States*, page 84, approved 16th March, 1861, had juris-diction of the cases pending in the District Courts of the United States in Georgia, as well as in the other States of the Confederacy. Georgia had, in fact, made no disposi-tion of any of the causes pending in the United States Courts for Georgia, and never did create any tribunal for their adjudication. Her action, in reference to the matter, was inchoate merely, and not complete : hence, the case was properly before the Confederate States Court for decision. This Court having jurisdiction of the case, then, it is not denied that its judgment is conclusive. It follows, then, that the Court below committed no error in admitting the transcript from the record of the District Court C. S. A., at Savannah. Nor do we see any error in rejecting the evidence showing the value of the services of counsel for Bass in that case. Indeed, this claim was predicated upon the idea that the record should be ruled out; and if the re-cord was properly admitted, this evidence was rightfully re-pelled.

[4.] During the progress of the trial, Bass proposed to prove by the witness, McElroy, certain stipulations not embraced in the written contract. This was objected to and the evi-dence repelled, on the ground, as we understand it, that parol evidence is inadmissible to engraft an additional stipulation upon a contract evidenced by writing. In *Logan et. al. vs. Bond*, 13 *Ga. R.*, 198, this Court says, "the uniform deci-sions of this Court have been, that all oral negotiations be-tween the parties to a written contract, which either pre-ceded or accompanied the execution of the instrument, are to be regarded as merged in it, and that the writing is to be treated as the exclusive medium of ascertaining the agree-ment to which the contractors bound themselves." And in *Wynn, Shannon & Co. vs. Cox*, 5 *Ga. R.*, 376, the Court uses this language : "It is neither more nor less than an attempt

to add to a written instrument by parol evidence, a stipulation which it is insisted was entered into *at the time*, but which the parties did not see fit to have incorporated. We are satisfied that this can not be done without infringing one of the soundest and most wholesome rules which Courts of justice have devised for the security of private property"—citing numerous authorities. And the opinion continues: "These authorities establish, not only the general proposition that all *previous* negotiations resting in parol, but those also which were had *at the time*, are merged and extinguished by the writing; and that, allowing that the instrument does not contain the whole contract, oral proof is inadmissible to supply the deficency, unless it was occasioned by some fraud practiced by the vendor, or by some mistake or surprise on his part." These authorities seem to sustain the decision of the Court below.

[5.] There is another ground, however, upon which, even if the Court erred in repelling the evidence at the time it was offered, would have required him to have withdrawn it, in a subsequent portion of the trial, had it been admitted; or, at any rate, would have required him to have instructed the jury that it could not avail the defendant anything. The record of the proceedings of the Court at Savannah showed that the same defence had been passed upon, and was, therefore, *res adjudicata*. We think, therefore, the Court did right in rejecting McElroy's answer to the sixteenth interrogatory.

We are unable to see any error in the rejection of Judge Nisbet's testimony, offered for the purpose of showing that Bass proposed to cancel the trade on certain terms. There was no allegation of fraud, or other ground, upon which Bass had a right to *demand* a rescission of the contract; and if not, we can consider the offer in no other light than that of a proposition to re-sell to Freeman, which he had a right to accept or reject as he should see proper.

From what has already been said upon the subject of the admissibility and effect of the record of the judgment in the District Court at Savannah, and the rejection of McElroy's

roy's testimony, it will be seen that we approve of the charge of the Court numbered 2.

[6.] By the contract, Freeman conveyed the negroes to Bass : the title vested in him; but by the second paper, the bond for titles, and which was assented to by Bass, and, therefore, binding on him, Freeman reserved a lien upon the negroes for the payment of the purchase money.   Counsel for Bass insists that the reservation of this "lien" by Freeman was a mortgage from Bass to him of the negroes, and by the statutes of Arkansas, where this contract was made, the mortgagee has the legal title.   It is a sufficient reply that these papers do not make a mortgage according to the common law.   The ancient way of making a mortgage was by a charter of feoffment, on condition that if the feoffor or his heirs paid the sum borrowed to the feoffee, or his heirs, at a day appointed, he should re-enter and re-possess ; and sometimes the condition was contained in the charter of feoffment, and sometimes it was "*defeasanced*" by a distinct instrument.   2 *Thomas' Coke, Lit.* 34–5, *and note Z.* Here there was no "feoffment" to Freeman; he simply reserved a "lien" upon the property which was conveyed to Bass with this incumbrance upon it; nothing more, nothing less.   But we do not understand that by the laws of Arkansas a mortgage conveys a legal title to the mortgagee. Those laws, as we understand them, like ours, consider a mortgage as a mere security, an incumbrance created by the mortgagor upon the property, while the *title* remains in him. We think, then, the Court committed no error in holding that this "lien" was a mere security.

In the cases of *Hand vs. Armstrong* (*ante p.* 232) *and Bass vs. Ware,* decided during the present term, we have given our views upon the questions made by the charge of the Court numbered 4.   In these cases we laid down the same doctrines as those contained in the charge under consideration, together with our reasons therefor, and deem it unnecessary to repeat them here.

Judgment affirmed.